The PEOPLE of the State of Colorado, Complainant,

v.

Mark Joseph FISCHER, Respondent.

No. 02PDJ058.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Feb. 5, 2003.

Opinion by a Hearing Board consisting of the Presiding Disciplinary Judge, ROGER L. KEITHLEY, and Hearing Board Members SHERRY A. CALOIA, a member of the bar, and LARRY A. DAVELINE, a representative of the public.

## OPINION AND ORDER IMPOSING SANCTIONS

### SANCTION IMPOSED: ATTORNEY DISBARRED

A trial pursuant to C.R.C.P. 251.18(d) was held on November 12, 2002, before a Hearing Board consisting of the Presiding Disciplinary Judge ("PDJ") and two Hearing Board Members, Sherry A. Caloia, a member of the bar, and Larry A. Daveline, a representative of the public. Kim E. Ikeler, Assistant Regulation Counsel, represented the People of the State of Colorado (the "People"). Ralph A. Cantafio represented the respondent, Mark J. Fischer ("Fischer") who was also present.

On September 3, 2002, the People moved for Judgment on the Pleadings with regard to claims three four, five and six alleged in the Complaint. On October 1, 2002, Fischer filed a responsive pleading, confessing the motion as to claims four, five, and six. The PDJ granted the Motion for Judgement on the Pleadings by Order dated October 3, 2002 as to claims four, five and six.

On September 13, 2002, the People moved for Summary Judgment as to claims one and two of the Complaint. On October 1, 2002, Fischer filed a responsive pleading confessing the motion as to these claims. On October 3, 2002, the PDJ granted the motion, establishing a violation of claims one and two. The People withdrew claim three.

At the trial on November 12, 2002, the following witnesses testified on behalf of Fischer: Dan Ellingson, Bryon Rickman, Michael A. O'Hara, and Nancy Muhme. Judge Richard P. Doucette testified by telephone. Fischer testified on his own behalf: Fischer offered and the PDJ admitted the following exhibits into evidence: exhibits A, B, C, C–1, D, E, F, G, H, I–1, I–2, J, K, L, M and N. The Hearing Board considered the People's argument and Fischer's argument in mitigation, the evidence presented by Fischer in mitigation, Fischer's Trial Brief filed November 6, 2002, the Stipulation of Facts set forth in the Trial Management Order filed October 25, 2002, and made the following findings of fact which were established by clear and convincing evidence.

### I. FINDINGS OF FACT

On November 6, 2002, the People and Fischer submitted the following Stipulation of Facts in this proceeding. The Stipulated Facts are therefore findings of fact for purposes of this Opinion and Order:

1. Mr. Fischer has taken and subscribed the oath of admission, was admitted to the bar of this court on May 17, 1976, and is registered upon the official records of this court, registration no. 07161. He is subject to the jurisdiction of this court in these disciplinary proceedings. Mr. Fischer's registered business address is P.O. Drawer 490, Hayden, Colorado 81639.

2. This case arises out of a divorce between Gerald Hallman ("Mr. Hallman") and Fran McKinney ("Ms. McKinney"). Melanie Douglas, Esq. represented Mr. Hallman and Mr. Fischer represented Ms. McKinney. The principal asset of the marriage was a piece of real property located near Hayden, Colorado, known as 42855 McGuire Lane (the "property"). The property was unimproved land, except for a mobile home located on it.

3. In September, 2001, Mr. Hallman and Ms. McKinney entered into a Separation and Property Settlement Agreement (the "Separation Agreement"). The Separation Agreement, paragraph 3, provided that Ms. McKinney was to sell the land and the mobile home. Out of the closing proceeds, Ms. McKinney agreed to pay a number of debts specifically enumerated in paragraph 3 of the Separation Agreement. These debts included three liens secured by the land, personal debts owed by Ms. McKinney and Mr. Hallman, a $10,000 tax obligation, $36,000 due on the purchase price of the mobile home, with $10,000 to be distributed to Mr. Hallman. The Separation Agreement, paragraph 3, further provided that Ms. McKinney would be responsible for all costs of closing, attorney fees, title fees and other such costs. Only after all these debts were paid, Ms. McKinney was entitled to receive net proceeds, if any.

4. The same paragraph of the Separation Agreement specifically provided that payment of the debts would be made either directly out of the closing proceeds or, if not paid at closing, out of proceeds deposited in Mr. Fischer's trust account.

5. The Separation Agreement was made an Order of court pursuant to a Decree of Dissolution of Marriage entered September 18, 2001 (hereinafter the "Court Order"). The Court Order was signed by the Honorable Richard P. Doucette, the Chief Judge of the Fourteenth Judicial District, of which Routt County is a part. In the Court Order, Judge Doucette specifically Ordered: "[e]ach party shall perform all of the applicable provisions of the Separation Agreement...."

6. Ms. McKinney encountered difficulties in selling the property. Mr. Hallman neglected to obtain certain permits related to the mobile home and failed to register the mobile home with the county. As a result, a certificate of occupancy had never been issued for the mobile home. Also certain taxes had not been paid. These problems in turn made it difficult for a prospective buyer to find financing to purchase the real property.

7. Ultimately, Mr. Fischer located a private investor to finance $70,000 of the purchase price of the real property and Ms. McKinney agreed to take back a secured promissory note for $23,000. The promissory note was due after the initial closing of the sale of the property. Because of this, there were two closings, the first in early November, 2001 and the second in December, 2001.

8. Neither Mr. Hallman nor his attorney, Ms. Douglas, attended either of the closings. However, in a letter to Mr. Fischer in October, 2001, prior to the first closing, Ms. Douglas confirmed her understanding that Mr. Fischer would be disbursing $10,000 to Mr. Hallman out of the proceeds of the sale held in Mr. Fischer's trust account.

9. After the first closing, Mr. Fischer on November 6, 2001, wrote to Ms. Douglas. He stated that the liens on the property had been paid out of the closing proceeds. Mr. Fischer stated that, from the remaining funds, he had paid certain of Ms. McKinney's personal debts and paid $4,000 to himself for fees accrued in the divorce proceedings. Mr. Fischer explained that, because Ms. McKinney had taken the $23,000 promissory note in lieu of full payment of the purchase price, "[t]he other debts that Franni [Ms. McKinney] is obligated to pay under the terms of the Separation Agreement will be dealt with when the $23,000 payment is made." Mr. Fischer neglected to inform Ms. Douglas that, from the proceeds available at the first closing, Mr. Fischer had transferred $28,000 to an escrow account for Ms. McKinney's benefit and had paid her an additional $9,616.10.[1] With regard to the $10,000 payment due to Mr. Hallman, Mr. Fischer stated:

1. Mr. Fischer did not reveal this until he filed his      Accounting with the court.

I was instructed not to pay Jerry [Mr. Hallman] any money at this time. Franni [Ms. McKinney] had to discount the property by at least $5,000 because of the inadequate and unapproved sewer system. At this time I am uncertain if Franni [Ms. McKinney] will instruct me to pay $5,000 to Jerry [Mr. Hallman] out of the proceeds of the second deed of trust when it is paid.

10. In making his determination to pay certain debts, and not others, to disburse amounts to Ms. McKinney, and to pay himself $4,000 for accrued fees, Mr. Fischer claims to have acted at the direction of his client, Ms. McKinney. Although Mr. Fischer was aware, *e.g.*, of Mr. Hallman's claim to $10,000 of the proceeds, Mr. Fischer did not seek the court's direction concerning disbursement of the proceeds of the first closing; nor did Mr. Fischer place any portion of the proceeds in escrow or retain any portion in his trust account.

11. Mr. Fischer claims that, on November 30, 2001, before the second closing, his paralegal, Nancy Muhme, telephoned Melanie Douglas and left a message that Ms. McKinney had instructed Mr. Fischer not to pay any of the sale proceeds to Mr. Hallman. Ms. Douglas denies receiving this message.

12. Despite having received an additional $23,000 at the second closing in December, 2001, Mr. Fischer made no provision for paying Mr. Hallman. Nor did Mr. Fischer retain in his trust account the disputed funds. Mr. Fischer did not seek the direction of the Routt County District Court as to resolution with disputes concerning these monies, but instead at the direction of his client disbursed all of the funds from the second closing, including to himself and Ms. McKinney.

13. In early December, 2001, Ms. Douglas on behalf of Mr. Hallman, filed a Motion for Release of Money Pursuant to the Settlement Agreement. Ms. McKinney filed a Response to the same. After some procedural delays, another Routt County District Court Acting Judge, the Honorable James Herbert

Garrecht, entered an Order setting the matter for a Hearing on March 11, 2002. Judge Garrecht at that time also Ordered Mr. Fischer to provide an accounting.

14. Mr. Fischer filed his Accounting to Court on February 19, 2002. Mr. Fischer attached to the Accounting to Court an exhibit showing that, at the first and second closings, Ms. McKinney had received a total $53,108.30 and Mr. Fischer had received a total of $6,468. Mr. Fischer had not paid the "$10,000" tax obligation, nor had Mr. Fischer paid Mr. Hallman the $10,000 required by the Separation Agreement.[2] As justification for the latter omission Mr. Fischer stated:

> Ms. McKinney directed me as her attorney to withhold paying Mr. Hallman any part of the closing proceeds because of the losses incurred due to the acts of Mr. Hallman in failing to disclose significant issues regarding the mobile home.

15. The matter came on for Hearing on March 11, 2002 before Judge Doucette. The court provisionally entered Judgment in favor of Mr. Hallman and against Ms. McKinney in the amount of $47,083.82 plus attorney fees. In its Minute Order, the court stated:

> JUDGMENT IS BASED UPON THE FAILURE OF THE RESPONDENT [MS. MCKINNEY] TO PERFORM PURS[UANT] TO THE TERMS OF THE SETTLEMENT AGREEMENT WHICH WAS INCORPORATED INTO THE DECREE OF DIVORCE AND MADE AN ORDER OF THIS COURT ON 9/18/01. FUNDS FROM THE SALE OF PROPERTY WERE NOT DISBURSED IN ACCORDANCE WITH THE AGREEMENT OF THE PARTIES AND THE ORDER OF THE COURT.
>
> IT APPEARS THAT THE RSP [MS. MCKINNEY] INSTRUCTED MR. FISCHER TO DISBURSE FUNDS CONTRARY TO THE TERMS OF THE SETTLEMENT AGREEMENT ORDERED BY THE COURT.

---

**2.** The Accounting to Court also showed that Mr. Fischer failed to pay $36,000 to retire the debt on the mobile home. This appears to have been because the purchasers declined to buy the mobile home. However, the purchasers subsequently began to make monthly payments on the mobile home debt. The Accounting to Court further showed that Mr. Fischer failed to pay some minor credit card and personal debts of Mr. Hallman.

16. Because Mr. Fischer had been permitted to withdraw prior to the March 11, 2002 Hearing, and because Ms. McKinney failed to appear at the Hearing, the judge delayed entry of Judgment in Order to give Ms. McKinney time to object. Ms. McKinney never so objected, although she did hire counsel to represent her.

17. Said provisional Judgment of March 11, 2002 has since been vacated by Stipulation of the parties and Order of the District Court of Routt County.

18. Mr. Fischer has stated that, at the time he made disbursements of the sale proceeds from his trust account to his client and himself, he did not think of himself as being a trustee following a Court Order. Instead, he viewed himself as "helping these people to get this thing done" and as "trying to get this done the way the people wanted it done." Mr. Fischer several months ago admitted that he should have seen his role as an officer of the court, following the court's direction as set forth in the Court Order. Mr. Fischer also agreed several months ago that he either should have followed the disbursement schedule set forth in Paragraph 3 of the Separation Agreement or first sought Court approval prior to the making of any different disbursement.

19. Mr. Hallman was damaged or potentially damaged by Mr. Fischer's conduct in at least the following respects. First, Mr. Hallman did not timely receive the $10,000 he was due as his share of the equity of the land. Second, Mr. Hallman remained liable on the "$10,000" tax obligation. Mr. Fischer has since paid Mr. Hallman his $10,000. Mr. Fischer has also paid such tax obligation to the Colorado Department of Revenue in full.

20. On or about July 17, 2002, Respondent paid to Hallman the sum of $10,000 as originally required in the Separation Agreement. Mr. Fischer at that time also paid to counsel for Mr. Hallman, Ms. Douglas, the sum of $3,794.97 representing attorneys fees and costs incurred by Mr. Hallman as a result of Mr. Fischer's failure to pay proceeds of the sales of real estate as directed in Paragraph 3 of the Separation Agreement. Mr. Fischer also, at that time, agreed to become personally liable for the indebtedness set forth in the approximate amount of $36,000.00 owed to Conseco as to the unsold mobile home and by Assignment assumed such debt. Conseco has agreed to permit such assignment, but documents finalizing the same have not yet been finalized or executed. Neither Mr. Hallman nor Ms. McKinney shall any longer be liable upon the indebtedness after the assignment to Mr. Fischer. On or about September 6, 2002, Mr. Fischer paid to Ms. Douglas the sum of $400 owed to a Mike McGlone as set forth in Paragraph 3 of the Separation Agreement. As set forth in that certain correspondence dated September 24, 2002, Mr. Fischer paid over the sum of $3,596.48 to the Colorado Department of Revenue resolving in full issues as to the "$10,000 tax obligation" as set forth in the Separation Agreement. Ms. Douglas stated at her deposition, and Mr. Fischer concurs, that Mr. Fischer has now completely satisfied all financial terms and conditions outlined in Paragraph 3 of the Separation Agreement.

## II. CONCLUSIONS OF LAW AND IMPOSITION OF SANCTION

The Complaint in the within matter alleges that Fischer violated Colo. RPC 8.4(c) in claim one; Colo. RPC 1.15(a) in claim two; Colo. RPC 1.15(b) in claim four; Colo. RPC 1.15(c) in claim five, and Colo. RPC 3.4(c) in claim six.

■ Fischer has conceded that he has violated Colo. RPC 8.4(c)(it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) in that he knowingly converted funds belonging to third parties as set forth in claim one. Fischer exercised unauthorized dominion or control over funds in the amount of $6,468, belonging to his client, Hallman and third parties. He used a portion of the funds to pay his own fees contrary to the express language of the Separation Agreement made an order of court, constituting knowing misappropriation. Knowing misappropriation consists of an attorney taking funds of a client or a third person entrusted to him, knowing that it is the client's or third person's money and knowing that the client

**378**

or third person has not authorized the taking. *See People v. Rishel,* 50 P.3d 938, 942 (Colo.O.P.D.J.2002)(holding that knowing conversion by an attorney of funds belonging to a third party falls within the scope of Colo. RPC 8.4(c)). Under the facts of this case, once the court entered its order directing the distribution of funds, Fischer's client no longer retained authority to direct distribution of the funds at variance with the court's order.

Fischer also confessed that he failed to hold proceeds of the sale of marital property between his client and Hallman separate and distinct from his own property in violation of Colo. RPC 1.15(a)(failure to hold property of clients or third persons separate from the attorney's own property). As a consequence of his failure to make disbursements to third parties consistent with the Separation Agreement, he violated Colo. RPC 1.15(b)(failing to deliver to third persons funds that the third persons are entitled to receive), and that he failed to keep disputed amounts separate until he could secure a court ruling resolving such a dispute, commingling the same in violation of Colo. RPC 1.15(c)(failing to keep disputed property separate until there is an accounting and severance of the disputed interest). Additionally, Fischer confesses that he knowingly ignored and disobeyed an order of court as set forth in the court's Final Orders incorporating the Separation Agreement between the parties and thereby violated Colo. RPC 3.4(c)(knowing disobedience of an obligation under the rules of a tribunal).

### III. IMPOSITION OF SANCTIONS

■ The presumptive sanction for knowing conversion of client property entrusted to an attorney is disbarment. *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996)(holding that "[k]nowing misappropriation [for which the lawyer is almost invariably disbarred]) 'consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking.'" (citation omitted). "Misappropriation includes 'not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain

or benefit therefrom.'" *Id.* (citation omitted). "The motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation." *Id.* "Moreover, '[i]ntent to deprive permanently a client of misappropriated funds ... is not an element of knowing misappropriation.'" (citation omitted). Knowing conversion of a third parties' funds entrusted to the attorney also warrants disbarment. *See People v. Torpy,* 966 P.2d 1040, 1043 (Colo.1998)(lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation).

Fischer's handling of the proceeds of the marital assets resulting in violations of Colo. RPC 1.15(a), Colo. RPC 1.15(b) and Colo. RPC 1.15(c) confirm that disbarment is warranted. *See People v. Adkins,* 57 P.3d 750, 752 (Colo.O.P.D.J.2001)(attorney disbarred for knowing conversion of funds and violation of Colo. RPC 1.15(a) by failing to hold a client's property in her possession separate from her own property); *In re Cleland,* 2 P.3d 700, 701 (Colo.2000)(attorney disbarred for exercising dominion and control over funds which were claimed by both the attorney and his client, without the client's authorization, and before the resolution of the attorney's claim for additional legal services in violation of Colo. RPC 1.15(c)); *In re Berryman,* 764 A.2d 760, 767 (D.C.App.2000)(attorney violated Rule 1.15(a) by depositing funds in a personal account which belonged to her deceased client's estate, thereby preferring herself to other debt creditors and beneficiaries).

■ Fischer's knowing violation of Colo. RPC 3.4(c) standing alone warrants disbarment. Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding. *See People v. Roose,* 44 P.3d 266, 271 (Colo.O.P.D.J.2002)(*appeal filed sub nom. In Re Roose,* Colo. No. 02SA155, May 7, 2002). Fischer's conduct was intended to benefit himself and his client at the expense

of others contrary to the express directions of the court order.

■ The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") are the guiding authority for selecting the appropriate sanction to impose for lawyer misconduct. ABA *Standard* 4.11 provides that "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." ABA *Standard.* 6.21 provides that "[d]isbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party."

Although Fischer has made efforts to make Hallman and other third parties whole, his misconduct resulted in injury to the client and to third parties. McKinney initially had a judgment entered against her and was constrained to hire replacement counsel. Hallman and the third parties involved in the division of marital assets did not timely receive the funds they were due pursuant to the order of court.

Aggravating and mitigating factors were considered pursuant to ABA *Standards* 9.22 and 9.32 respectively in arriving at the appropriate sanction. In aggravation, Fischer had a dishonest or selfish motive, *see id.* at 9.22(b). Fischer has substantial experience in the practice of law, having practiced law in the State of Colorado for approximately twenty-five years at the time of the conduct giving rise to this action, *see id.* at 9.22(i). Fischer has had prior discipline, an aggravating factor under ABA *Standard* 9.22(a). He received a Letter of Admonition in May 1993, for a violation of DR6–101(A)(3), the precursor to Colo. RPC 1.3, for his neglect in representing an estate.

In mitigation, Fischer asserted that he made restitution to the parties he harmed, which may be considered as a mitigating factor pursuant to ABA *Standard* 9.32(d), however the payments were made following the filing of a Request for Investigation and Fischer faced the threat of a lawsuit. Under the circumstances, little weight is accorded Fischer's payment of restitution.

Fischer was cooperative in these disciplinary proceedings, *see id.* at 9.32(e). Considerable evidence was presented of Fischer's excellent reputation in his community, *see id.* at 9.32(g). He has throughout the years given his time to *pro bono* activities and serves on several boards. He practices in any area of the state where few attorneys are available. Additionally, Fischer expressed remorse, *see id.* at 9.32(*l*). While these factors weigh in Fischer's favor, they are not sufficient to overcome the presumption of disbarment. As our Supreme Court stated in *Torpy,* 966 P.2d at 1046:

> [D]isbarment is the only appropriate outcome where it has been shown, by clear and convincing evidence, that the lawyer has knowingly misappropriated client funds. In a recent case involving similar mitigating factors, the New Jersey Supreme Court was asked to abandon its strict conformity to the same rule we uphold today. *See In re Greenberg,* 155 N.J. 138, 714 A.2d 243, 250 (1998). That court declined to do so:

> Today we reaffirm the rule announced in *[Matter of] Wilson* [81 N.J. 451, 409 A.2d 1153 (1979)] and hold that disbarment is the appropriate sanction in cases where it has been shown, by clear and convincing evidence, that an attorney has knowingly misappropriated client funds. We accept as an inevitable consequence of the application of this rule that rarely will an attorney evade disbarment in such cases. Public confidence in the "integrity and trustworthiness of lawyers" requires no less. *Id.* We also believe that this rule remains sound, and that to allow deviation without an extraordinary reason to do so would create uncertainty and inevitably lead to even less equitable results than adherence to the rule would. *Id.*

Despite the considerable mitigating factors presented by Fischer, as the Supreme Court has consistently stated, knowing misappropriation of funds belonging to clients or to third parties greatly diminishes the trust inherent in the attorney-client relationship and in the legal profession as a whole. Accordingly, it is in the best interest of the public

and the bar to adhere to a strict interpretation of the rule. *See People v. Katz*, 58 P.3d 1176, 1195 (Colo.O.P.D.J.2002)(*appeal filed sub nom. In re Katz*, Case No. 02SA348, November 25, 2002)(disbarring attorney for knowing misappropriation of funds to which another attorney and third parties claimed an interest and holding that disciplinary proceedings are intended to protect the public, *citing* ABA *Standard* 1.1, and stating that "[a]n attorney's use of funds to which a third party whether the client, another attorney or a lien holder—claims an interest, strikes at the heart of the fiduciary duties the attorney must hold paramount." (citation omitted)).

## IV. ORDER

It is therefore ORDERED:

1. MARK JOSEPH FISCHER, attorney registration 07161, is DISBARRED from the practice of law effective thirty-one (31) days from the date of this Order and his name shall be stricken from the roll of attorneys licensed to practice law in the State of Colorado.

2. Fischer is Ordered to pay the costs of these proceedings; the People shall submit a Statement of Costs within ten (10) days of the date of this Order. Respondent shall have five (5) days thereafter to submit a response thereto.

## EXHIBIT A

## COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

### Jurisdiction

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on May 17, 1976, and is registered upon the official records of this court, registration no. 07161. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is P.O. Drawer 490, Hayden, Colorado 81639.

### General Allegations

4. This case arises out of a divorce between Gerald Hallman ("Hallman") and Fran McKinney ("McKinney"). Melanie Douglas represented Hallman and respondent represented McKinney. The principal asset of the marriage was a piece of real property located near Hayden, Colorado ("the property"). The land was unimproved except for a mobile home located on it.

5. In September, 2001, Hallman (represented by Douglas) and McKinney (represented by respondent) entered into a Separation and Property Settlement Agreement (the "Separation Agreement"). The Separation Agreement provided that McKinney was to sell the land and the mobile home. Out of the closing proceeds, McKinney agreed to pay a number of debts specifically enumerated in the Separation Agreement. These debts included three liens secured by the land, personal debts owed by McKinney and Hallman, a $10,000 tax obligation, $36,000 due on the purchase price of the mobile home, and $10,000 to be distributed to Hallman. The Separation Agreement further provided that McKinney would be responsible for all costs of closing, attorney fees, title fees and other such costs. After all these debts were paid, McKinney was entitled to receive any net proceeds.

6. The Separation Agreement specifically provided that payment of the debts would be made either directly out of the closing proceeds or, if not paid at closing, out of proceeds contained in respondent's trust account.

7. The Separation Agreement was made an order of court pursuant to a Decree of Dissolution of Marriage entered September 18, 2001 (hereinafter the "court order"). The court order is signed by the Honorable Richard P. Doucette, the Chief Judge of the Fourteenth Judicial District, of which Routt County is a part. In the court order, Judge Doucette specifically ordered that "[e]ach party shall perform all of the applicable provisions of the Separation Agreement ...."

8. McKinney encountered some difficulties in selling the property. Apparently, Hallman had neglected to obtain certain permits

related to the mobile home and had failed to register the mobile home with the county. As a result, a certificate of occupancy had not been issued for the mobile home and certain taxes had not been paid. These problems in turn made it difficult for a prospective buyer to find financing.

9. Ultimately, respondent located a private investor to finance $70,000 of the purchase price and McKinney agreed to take back a secured promissory note for $23,000. The promissory note was due after the initial closing of the sale of the property. Because of this, there were two closings, the first in early November, 2001 and the second in December, 2001.

10. Neither Hallman nor his attorney, Melanie Douglas, attended the closings. Ms. Douglas claims she was not informed of when the closings were to take place. However, based on the provisions in the Separation Agreement set forth above, Ms. Douglas understood that respondent would be disbursing $10,000 to Hallman out of the proceeds of the sale held in respondent's trust account. Ms. Douglas confirmed her understanding to respondent in writing in October, 2001, prior to the first closing.

11. After the first closing, respondent wrote to Ms. Douglas. He stated that the liens on the property had been paid out of the closing proceeds. Respondent stated that, from the remaining funds, he had paid certain of McKinney's personal debts and paid $4,000 to himself for fees accrued in the divorce proceedings. Respondent explained that, because McKinney had taken the $23,000 promissory note in lieu of full payment of the purchase price, "[t]he other debts that Franni [McKinney] is obligated to pay under the terms of the Separation Agreement will be dealt with when the $23,000 payment is made …." Respondent neglected to inform Ms. Douglas that, from the proceeds available at the first closing, respondent had transferred $28,000 to an escrow account for McKinney's benefit and had paid her an additional $9,616.10. With regard to the $10,000 payment due to Hallman, respondent stated:

I was instructed not to pay Jerry [Hallman] any money at this time. Franni [McKinney] had to discount the property by at least $5,000 because of the inadequate and unapproved sewer system. At this time I am uncertain if Franni [McKinney] will instruct me to pay $5,000 to Jerry [Hallman] out of the proceeds of the second deed of trust when it is paid.

12. In making his determination to pay certain debts, and not others, to disburse amounts to McKinney, and to pay himself $4,000 for accrued fees, respondent claims to have acted at the direction of his client, McKinney. Although respondent was aware of Hallman's claim to $10,000 of the proceeds, respondent did not seek the court's direction concerning disbursement of the proceeds of the first closing; nor did respondent place any portion of the proceeds in escrow or retain any portion in his trust account.

13. Respondent claims that, on November 30, 2001, before the second closing, respondent's paralegal telephoned Melanie Douglas and left a message that McKinney had instructed respondent not to pay any of the sale proceeds to Hallman. Ms. Douglas denies receiving this message.

14. Despite having received an additional $23,000 at the second closing in December, 2001, respondent made no provision for paying Hallman. Nor did respondent retain in his trust account the disputed funds. Respondent did not seek the direction of the Routt County District Court, but instead ostensibly at the direction of his client disbursed all of the funds from the second closing, including to himself and McKinney.

15. In early December, 2001, Ms. Douglas on behalf of Hallman, filed a Motion for Release of Money Pursuant to the Settlement Agreement. After some procedural delays, another Routt County District Court Judge, the Honorable James Herbert Garrecht, entered an order setting the matter for a hearing on March 11, 2002. Judge Garrecht also ordered the respondent to provide an accounting.

16. Respondent filed his Accounting to Court on February 19, 2002. The respondent attached an exhibit showing that, at the first

and second closings, McKinney had received a total $53,108.30 and respondent had received a total of $6,468. Respondent had not paid the $10,000 tax obligation, nor had respondent paid Hallman the $10,000 required by the Separation Agreement.[3] As justification for the latter omission respondent stated:

> Ms. McKinney directed me as her attorney to withhold paying Mr. Hallman any part of the closing proceeds because of the losses incurred due to the acts of Mr. Hallman in failing to disclose significant issues regarding the mobile home.

17. The matter came on for hearing on March 11, 2002 before Judge Doucette. The court provisionally entered judgment in favor of Hallman and against McKinney in the amount of $47,083.82 plus attorney fees. In a Minute Order, the court stated:

> JUDGMENT IS BASED UPON THE FAILURE OF THE RESPONDENT TO PERFORM PURS[UANT] TO THE TERMS OF THE SETTLEMENT AGREEMENT WHICH WAS INCORPORATED INTO THE DECREE OF DIVORCE AND MADE AN ORDER OF THIS COURT ON 9/18/01. FUNDS FROM THE SALE OF PROPERTY WERE NOT DISBURSED IN ACCORDANCE WITH THE AGREEMENT OF THE PARTIES AND THE ORDER OF THE COURT.
>
> IT APPEARS THAT THE RSP [MCKINNEY] INSTRUCTED MR. FISCHER TO DISBURSE FUNDS CONTRARY TO THE TERMS OF THE SETTLEMENT AGREEMENT ORDERED BY THE COURT.

18. Because respondent had been permitted to withdraw prior to the March 11, 2002 hearing, and because McKinney failed to appear at the hearing, the judge delayed entry of judgment in order to give McKinney time to object. To date, McKinney has not done so, although she has hired counsel to represent her.

19. The respondent has stated that, at the time he made disbursements of the sale proceeds from his trust account to his client and himself, he did not think of himself as being a trustee following a court order. Instead, he viewed himself as "helping these people to get this thing done" and as "trying to get this done the way the people wanted it done." The respondent now admits that he should have seen his role as an officer of the court, following the court's direction as set forth in the court order. The respondent now agrees that he either should have followed the disbursement schedule set forth in the Separation Agreement or sought court approval of a different disbursement.

20. The complainant, Hallman, has been damaged or potentially damaged by respondent's conduct in the following respects. First, Hallman has not received the $10,000 he was due as his share of the equity of the land. Second, Hallman remains liable on the $10,000 tax obligation and, in fact, has had his year 2001 tax refund denied by the IRS based on the outstanding obligation. Third, Mr. Hallman remains liable on the personal and credit card debts, which continue to accrue interest. Fourth, Mr. Hallman remains liable on the outstanding balance of the mobile home loan.

### CLAIM I

#### (Engaging In Conduct Involving Dishonesty, Fraud, Deceit Or Misrepresentation—Colo. RPC 8.4(c))

19. Paragraphs 1 through 18 are incorporated herein as if fully set forth.

20. Rule 8.4(c), Colorado Rules of Professional Conduct, provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

---

3. The Accounting to Court also showed that respondent failed to pay $36,000 to retire the debt on the mobile home. This appears to have been because the purchasers declined to buy the mobile home. However, the purchasers subsequently began to make monthly payments on the mobile home debt. Although both Hallman and McKinney remain liable on the debt, to date the lender has take no steps to foreclose or accelerate.

The Accounting to Court further showed that respondent failed to pay some minor credit card and personal debts of Hallman.

21. Respondent violated Colo. RPC 8.4(c) by knowingly converting Hallman's funds and funds which were to be paid to satisfy Hallman's and McKinney's tax obligations, obligations to the mobile home lender and obligations to other minor creditors. Rather than disburse these funds as required by the court order, respondent used a portion of the funds to pay his own fees incurred in the divorce proceeding and in the sale of the property. The facts which demonstrate respondent's violation of Colo. RPC 8.4(c) are as follows:

a. Pursuant to the Separation Agreement, respondent was to disburse from his trust account payment of a $10,000 tax obligation, payment of other personal debts owed by McKinney and Hallman, payment of $36,000 due on the purchase of the mobile home, and $10,000 to be distributed to Hallman. Only after these debts were paid was McKinney entitled to receive any proceeds. The Separation Agreement further provided that McKinney would be responsible for attorneys fees associated with the sale of the property.

b. Based on this payment schedule, made a court order, respondent should not have disbursed attorneys fees to himself. Instead, respondent should have disbursed monies in accordance with the schedule, and then been paid his attorney fees by McKinney from any net proceeds. At the least, respondent should not have disbursed attorneys fees to himself until the $10,000 tax obligation, the personal debts owed by McKinney and Hallman, the $36,000 due on the mobile home, and the $10,000 to be distributed to Hallman had been paid.

c. As discussed in more detail above, from the first and second closings combined, respondent disbursed to himself a total of $6,468. Based on the payment schedule set forth in the Separation Agreement and incorporated into the court order, these monies should have been used to pay portions of the $10,000 tax obligation, the $36,000 debt on the mobile home, other minor debts, and/or the $10,000 to which

Hallman was due. By making payments to himself in preference of these prior obligations, respondent effectively converted and commingled the monies.

22. The taxing authorities, the mobile home lender, the other creditors, and Hallman have been damaged by respondent's conduct. Hallman has not received the $10,000 he was due as his share of the equity of the land. Hallman remains liable on the $10,000 tax obligation and, in fact, has had his year 2001 tax refund denied by the IRS based upon the outstanding obligation. Hallman also remains liable on the outstanding balance of the mobile home loan and on the personal and credit card debts, which continued to accrue interest. Although the present occupants of the mobile home appear to be making payments, should they cease to do so, the mobile home lender may be jeopardized because foreclosure upon the mobile home may be impractical or may not yield proceeds sufficient to cover the outstanding debt. And, the IRS and the minor creditors have not received the monies due them.

23. As shown by the foregoing, respondent knowingly and intentionally disbursed to himself funds which were the property of others. Through the unauthorized exercise of dominion or ownership over the funds as described above, respondent knowingly converted or misappropriated funds belonging to the client. Through his knowing conversion or misappropriation of client funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation. Respondent should be subjected to discipline as provided by C.R.C.P. 251.5, for violation of Colo. RPC 8.4(c).

WHEREFORE, the complainant prays at the conclusion hereof.

### CLAIM II

**(Failure To Hold Property Of Clients Or Third Persons Separate From the Attorney's Own Property—Colo. RPC 1.15(a))**

24. Paragraphs 1 through 23 are incorporated herein as if fully set forth.

25. Colo. RPC 1.15(a), Colorado Rules of Professional Conduct, provides: "In connec-

tion with a representation, an attorney shall hold property of clients or third persons that is in an attorney's possession separate from the attorney's own property."

26. Respondent violated Colo. RPC 1.15(a) by failing to hold the proceeds of the sale of the real estate, the property of Hallman, McKinney and others, separate from respondent's own property. Instead, respondent made disbursement of a portion of those proceeds to himself. Respondent's violation of Colo. RPC 1.15(a) is shown by the following facts:

a. Pursuant to the Separation Agreement, respondent was to disburse from his trust account payment of a $10,000 tax obligation, payment of other personal debts owed by McKinney and Hallman, payment of $36,000 due on the mobile home, and $10,000 to be distributed to Hallman. Only after these debts were paid was McKinney entitled to receive any proceeds. The Separation Agreement further provided that McKinney would be responsible for attorneys fees associated with the sale of the property. As a result, respondent was not entitled to receive payment until McKinney did.

b. Based on the payment schedule, made a court order, respondent should not have disbursed attorneys fees to himself. Instead, respondent should have disbursed monies in accordance with the schedule, and then been paid his attorney fees by McKinney from any net proceeds. At the least, respondent should not have disbursed attorneys fees to himself until the $10,000 tax obligation, the personal debts owed by McKinney and Hallman, the $36,000 due on the mobile home, and the $10,000 to be distributed to Hallman had been paid.

c. Rather than follow the court order, respondent disbursed to himself out of the proceeds of the first closing $4,000 for fees accrued in the divorce proceedings. Respondent claims that he did so at the direction of his client, McKinney. But, respondent was not entitled to rely upon the direction of his client, because the sequence and amounts of the disbursements to be made from the sale proceeds were controlled by the Separation Agreement that was made an order of the court.

d. Respondent paid himself $4,000 in attorneys fees at a time when he had not yet made payment of certain debts owed by McKinney and Hallman, had not paid the debt owed on the mobile home, had not paid the $10,000 tax obligation, and had not paid Hallman the $10,000 due to him. Respondent thereby breached his fiduciary duties to these creditors. In violation of Colo. RPC 1.15(a), respondent disbursed funds due to these third persons to himself and, presumably, used them for personal purposes.

e. As discussed in more detail above, McKinney received an additional $23,000 at the second closing in December, 2001. However, respondent made no provision for paying the $10,000 tax obligation, certain other personal debts, the $36,000 debt on the mobile home, or the $10,000 due to Hallman. Instead, respondent disbursed all the funds from the second closing, including to himself and to McKinney.

f. From the first and second closings combined, respondent disbursed to himself a total of $6,468. Based on the payment schedule set forth in the Separation Agreement and incorporated into the Decree, these monies should have been used to pay the creditors listed above. By making payments to himself in preference of these prior obligations, respondent breached his duty as a fiduciary to keep separate monies due to them.

27. The taxing authorities, the mobile home lender, other minor creditors, and Hallman have been damaged by respondent's conduct. Hallman has not received the $10,000 he was due as his share of the equity of the land. Hallman remains liable on the $10,000 tax obligation and, in fact, has had his year 2001 tax refund denied by the IRS based upon the outstanding obligation. Hallman also remains liable on the outstanding balance of the mobile home loan and on the personal and credit card debts, which continue to accrue interest. Although the present occupants of the mobile home appear to be making payments, should they cease to do so,

the mobile home lender may be jeopardized because foreclosure upon the mobile home may be impractical or may not yield, proceeds sufficient to cover the outstanding debt. The IRS has not received repayment of the approximately $10,000 which it mistakenly paid to Hallman and McKinney.

28. As shown by the foregoing, respondent failed to hold the property of third persons in his possession separate from his own property. Respondent should be subjected to discipline as provided by C.R.C.P. 251.5, for violation of Colo. RPC 1.15(a).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM III

### (Alternative Claim of Negligent or Technical Conversion— Colo. RPC 1.15(a))

29. Paragraphs 1 through 28 are incorporated herein as if fully set forth.

30. Colo. RPC 1.15(a) provides that an attorney is required to hold the property of clients or third persons that is in an attorney's possession separate from the attorney's own property.

31. By allowing his trust account to dip below the amount of sale proceeds that the respondent was required to have kept in trust for payment of marital debts to third party creditors and payment to Hallman, respondent converted and/or misappropriated funds that should have been disbursed to the third party creditors and to Hallman. By removing these funds from the trust account, the respondent failed to hold the third party creditor's funds and Hallman's funds in trust. The respondent did not have the consent of the third party creditors or Hallman to keep such funds elsewhere.

32. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and also violates Colo. RPC 1.15(a).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM IV

### (Failing To Deliver To Third Persons Funds That The Third Persons Are Entitled To Receive—Colo. RPC 1.15(b))

33. Paragraphs 1 through 32 are incorporated herein as if fully set forth.

34. Rule 1.15(b), Colorado Rules of Professional Conduct, provides: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall, promptly or otherwise as permitted by law or by agreement with a client, deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, render a full accounting regarding such property."

35. Respondent violated Colo. RPC 1.15(b) by failing to make disbursements to Hallman, to the mobile home lender, to the taxing authorities and the other creditors in accordance with the schedule set forth in paragraph 3 of the Separation Agreement. Instead, respondent made disbursement to McKinney and himself based upon McKinney's wishes. In particular, the facts which demonstrate respondent's violation of Colo. RPC 1.15(b) are as follows:

a. Pursuant to the Separation Agreement, respondent was to disburse from his trust account payment of (a) a $10,000 tax obligation, (b) other personal debts owed by McKinney and Hallman, (c) $36,000 due on the purchase of the mobile home, and (d) $10,000 to be distributed to Hallman.

b. This payment schedule was made a court order. Respondent should have disbursed monies in accordance with the schedule, and then been paid his attorney fees by McKinney from any net proceeds.

c. However, respondent made no provision for paying the $10,000 tax obligation, the $36,000 debt on the mobile home, certain other debts, or the $10,000 due to Hallman. Instead, respondent, supposedly acting at the direction of his client, disbursed all the funds from the first and second closings, including to himself and McKinney. But, respondent was not entitled to rely upon the direction of his client,

because the sequence and amounts of the disbursements to be made from the sale proceeds was controlled by the Separation Agreement, that was made an order of the court.

d. From the first and second closings combined, respondent disbursed to McKinney a total of $53,108.30 and to himself a total of $6,468. Based on the payment schedule set forth in the Separation Agreement and incorporated into the court order, these monies should have been used to pay the $10,000 tax obligation, certain other debts, the $36,000 debt on the mobile home, and/or the $10,000 to which Hallman was due. By making payments to McKinney and to himself in preference of these prior obligations, respondent effectively converted the monies.

36. The taxing authorities, the mobile home lender, the minor creditors and Hallman have been damaged by respondent's conduct. Hallman has not received the $10,000 he was due as his share of the equity of the land. Hallman remains liable on the $10,000 tax obligation and, in fact, has had his year 2001 tax refund denied by the IRS based upon the outstanding obligation. Hallman also remains liable on the outstanding balance of the mobile home loan and on the personal and credit card debts, which continued to accrue interest. Although the present occupants of the mobile home appear to be making payments, should they cease to do so, the mobile home lender may be jeopardized because foreclosure upon the mobile home may be impractical or may not yield proceeds sufficient to cover the outstanding debt. And, the IRS has not received repayment of the $10,000 due it.

37. As shown by the foregoing, respondent failed to deliver to third persons property in his possession. Respondent should be subjected to discipline as provided by C.R.C.P. 251.5, for violation of Colo. RPC 1.15(b).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM V

### (Failing To Keep Disputed Property Separate Until There Is An Accounting And Severance Of The Disputed Interest—Colo. RPC 1.15(c))

38. Paragraphs 1 through 37 are incorporated herein as if fully set forth.

39. Rule 1.15(c), Colorado Rules of Professional Conduct, provides: "When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

40. Respondent violated Colo. RPC 1.15(c) (assuming that the respondent believed in good faith that a dispute existed between McKinney and Hallman concerning what amount of funds should be disbursed to Hallman) by failing to keep the disputed amount separate until there could be a court determination of the Hallman/McKinney dispute, including a court determination of whether respondent was entitled to receive fees under the sale proceeds of the real property. The facts which demonstrate respondent's violation of Colo. RPC 1.15(c) are as follows:

a. As discussed above, the Separation Agreement provided a schedule for disbursement of funds received from the proceeds of the sale of the land and the mobile home. McKinney was not able to sell the mobile home, and this presented an unforeseen problem because there were no proceeds from such a sale to be used to offset the $36,000 debt associated with the mobile home.

b. In addition, McKinney encountered difficulties in the sale of the land, because Hallman allegedly had neglected to obtain certain permits related to the mobile home and then failed to register the mobile home with the county. As a result, a certificate of occupancy had not been issued for the mobile and certain taxes had not been paid.

c. These problems made it more difficult for a prospective buyer to find financing. The problems eventually reduced the amount of the sale proceeds received by McKinney.

d. In correspondence with Ms. Douglas, Hallman's counsel, respondent raised at least some of these difficulties as a potential dispute between McKinney and Hallman. In particular, respondent stated that McKinney had instructed him not to pay Hallman because of the inadequate and unapproved sewer system.

e. However, although respondent was aware of Hallman's claims to $10,000 of the proceeds and although respondent was aware of other debts, the non-payment of which would impact Hallman, respondent did not seek the court's direction concerning disbursement of the proceeds of the sale of the property, respondent did not ask the court for a ruling with regard to the parties' dispute, and respondent did not place any portion of the proceeds in escrow or retain any portion in his trust account. Instead, respondent made disbursements to McKinney and himself of the disputed monies, as discussed above.

41. The taxing authorities, the mobile home lender, other minor creditors and Hallman have been damaged or potentially damaged by respondent's conduct. Hallman has not received the $10,000 he was due as his share of the equity of the land. The taxing authorities have not received the $10,000 owed to them by Hallman and McKinney. Hallman has had his year 2000 tax refund denied by the IRS based on the outstanding obligation. Hallman remains liable on the personal and credit card debts, which continue to accrue interest. Those creditors have not been paid. And the mobile home lender remains at risk should the present occupants of the mobile home cease making monthly payments.

42. As demonstrated by the foregoing, respondent failed to keep separate disputed funds in which the taxing authorities, the mobile home lender, Hallman and/or other creditors claimed interest. Instead, Hallman disbursed those monies, including to himself.

Based on the foregoing, respondent should be subjected to discipline as provided in C.R.C.P. 251.5, for violation of Colo. RPC 1.15(c).

WHEREFORE, the complainant prays at the conclusion hereof.

## I. CLAIM VI

### (Knowing Disobedience Of An Obligation Under The Rules Of A Tribunal— Colo. RPC 3.4(c))

43. Paragraphs 1 through 42 are incorporated herein as if fully set forth.

44. Rule 3.4(c), Colorado Rules of Professional Conduct, provides: "A lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

45. Respondent violated Colo. RPC 3.4(c) by knowingly ignoring and disobeying the court order, which incorporated the Separation Agreement and, in particular, by knowingly ignoring and disobeying the directions concerning disbursement of the sale proceeds contained in paragraph 3 of the Separation Agreement. Rather than follow the direction of the Court, the respondent supposedly made disbursements based up McKinney's wishes. The facts which demonstrate respondent's violation of Colo. RPC 3.4(c) are as follows:

a. As discussed in more detail above, the Separation Agreement was made an order of court. The court order specifically directs each party to perform all of the applicable provisions of the Separation Agreement. The provisions include paragraph 3, which sets forth a schedule for the disbursement of proceeds generated by the sale of the land and the mobile home.

b. The respondent knew of the court order.

c. As discussed above, respondent knowingly failed to follow that schedule, despite the fact that the Separation Agreement required him to take sale proceeds into his trust account and make disbursements therefrom. Instead, ostensibly at the direction of his client, respondent

knowingly disbursed $53,108.30 to McKinney and $6,468 to himself. Respondent knowingly failed to disburse $10,000 to the taxing authorities, $36,000 to the mobile home lender, $10,000 to Hallman and certain minor amounts to other creditors.

d. Respondent allegedly varied his performance from that set forth in the Separation Agreement because of a dispute between McKinney and Hallman arising from losses incurred due to the acts of Hallman in failing to obtain permits and pay taxes. However, respondent made no effort to bring these disputes before the Court. Instead, he claims he simply bowed to the wishes of his client without observing and fulfilling his obligations as a trustee for the marital creditors and for Hallman, as established by the court order and Separation Agreement.

46. A number of parties have been damaged by respondent's knowing disobedience of the court order. McKinney is now the subject of a stayed judgment entered in favor of Hallman and against her in the amount of $47,083.82 plus attorneys fees. The taxing authorities have not received the $10,000 due from Hallman and McKinney. Hallman has had his 2001 tax refund withheld because of this continuing debt. Hallman has not been paid the $10,000 required by the Separation Agreement. Other minor creditors of the couple also have not been paid. Nor has the debt on the mobile home been paid, although, as discussed above, the present occupants continue to make monthly payments.

47. The respondent has admitted that he should not have simply followed his client's direction, disbursing large amounts of money to her and to himself in preference to prior creditors. In hindsight, respondent admits that he should have seen his role as an officer of the court, following the court's direction as set forth in the court order. He agrees that he either should have fulfilled the disbursements schedule set forth in the Separation Agreement or sought court approval of a different disbursement.

48. Based on the foregoing, respondent should be subjected to discipline, as provided by C.R.C.P. 251.5, for violation of Colo. RPC 3.4(c).

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under in C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; that the respondent be appropriately disciplined for his misconduct; that the respondent be required refund to Hallman and the third-party creditors the monies which respondent took from the sale proceeds in preference of Hallman and those third-party creditors; that the respondent be required to make payment to the client protection fund, pursuant to C.R.C.P. 252.14(b) and/or provide restitution to Hallman and third parties; and that the respondent be assessed the costs of this proceeding.

Respectfully submitted this 29th day of July, 2002.